**POLAR TRADING, INC., Appellant,**

v.

**AMBOY CLOSEOUTS, INC. and Donald Alcorn, Respondents.**

**No. WD 49710.**

Missouri Court of Appeals,
Western District.

June 6, 1995.

J. Dale Youngs, Kansas City, for appellant.

Rebecca Yocum, Overland Park, Kan., for respondents.

Before HANNA, P.J., and BERREY and SPINDEN, JJ.

HANNA, Presiding Judge.

Plaintiff appeals the trial court's judgment in favor of the defendant. The plaintiff, Polar Trading, Inc. (Polar Trading), is a California corporation engaged in the business of manufacturing gift wrapping and accessories. The defendant, Amboy Closeouts, Inc. (Amboy), is a Missouri corporation which specializes in liquidation sales—buying manufacturers' inventory and closeouts for resale.

In October 1993, William Sayre, an independent sales representative of Polar Trading and Donald Alcorn, president of Amboy, negotiated a deal at a trade show in Chicago. Amboy agreed to purchase between 25,000 and 30,000 Christmas ornaments from Polar Trading at $.50 per ornament plus shipping. On November 3, 1993, Polar Trading shipped 14 cases of the ornaments (976 ornaments) to Amboy as samples. Amboy received the samples on November 11, and determined that they were in satisfactory condition. Polar Trading sent an invoice in the amount of $696.50 for the goods and shipping costs. Amboy never paid the bill.

Based on the good condition of the samples, Mr. Alcorn contacted Polar Trading on November 11, to arrange for shipment of the rest of the ornaments. He spoke to Ms. Vinie Chang, director of marketing for Polar Trading. Ms. Chang told Mr. Alcorn that since Polar Trading had never before done business with Amboy, it would require a $2000 deposit prior to shipping the goods. Due to the fact that Christmas was approaching and Amboy wanted the ornaments shipped immediately, Ms. Chang agreed to accept a fax of the deposit check, the original of which Mr. Alcorn agreed to put in the mail that day. Upon receipt of the faxed check, Ms. Chang confirmed the arrangement in a letter which she faxed to Mr. Alcorn. Mr. Alcorn testified at trial that, later that same day, he left a message on Ms. Chang's answering machine advising that he would not

be sending the check. Ms. Chang denies ever receiving that message. The following day, Polar Trading shipped 328 cases of ornaments to Amboy. Three days later, Polar Trading shipped the remaining 10 cases. A total of 352 cases (26,347 pieces) were shipped to Amboy.

On November 30, 1993, Mr. Alcorn left a message for Ms. Chang that the ornaments were defective. On December 6, he sent a letter which stated that the glue was not holding the ornaments together and asked that Polar Trading retrieve the goods. On December 28, Polar Trading arranged for Yellow Freight to pick up the goods. The parties agree that not all of the ornaments were picked up, although there is some discrepancy as to how many cases were actually retrieved.[1] At trial, Amboy admitted that it sold 1200–1500 pieces of merchandise and that some remained in the warehouse. Polar Trading maintained that Amboy had not accounted for 70 cases (6799 pieces). Polar Trading was eventually able to resell the returned ornaments for $1746.

Polar Trading filed suit against Amboy, asserting claims for fraudulent misrepresentation and breach of contract. The case was tried to the court on May 24, 1994. The only two witnesses called were Ms. Chang and Mr. Alcorn. The trial court entered judgment in favor of Amboy. Polar Trading appeals, arguing that the trial court erred in concluding as to the fraudulent misrepresentation claim: that Polar Trading did not rely on Mr. Alcorn's November 11 representation that he would send the deposit check; and that Polar Trading's damages were not caused by Amboy's misrepresentation. Polar Trading further argues that, as to the breach of contract claim, the trial court erred in entering judgment in favor of Amboy because Mr. Alcorn admitted at trial that Amboy had sold some of the goods and would owe Polar Trading for at least those ornaments retained and sold.

■ In its first two points, Polar Trading argues that the trial court erred in entering judgment in favor of the defendant on its claim of fraudulent misrepresentation. In particular, Polar Trading challenges two conclusions drawn by the court: (1) that Polar Trading did not rely on Alcorn's misrepresentation; and (2) that Polar Trading's damages did not result from Alcorn's representation that he would send the $2000 deposit check. The second issue is determinative.

■ In order to prove fraudulent misrepresentation, a plaintiff must prove: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth or falsity; (5) the speaker's intent that his representation be acted upon; (6) the hearer's reliance on the truth of the representation; (7) the hearer's right to rely on the representation; and (8) the hearer's consequent and proximate injury. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988).

■ In a court-tried case, our standard of review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), and we must affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or the trial court erroneously declared or applied the law. *Id.* at 32. We give the prevailing party the benefit of all favorable evidence and reasonable inferences to be drawn therefrom and disregard all evidence to the contrary. *Lisec v. Coy*, 793 S.W.2d 173, 175–76 (Mo.App.1990).

■ In order to prove fraudulent misrepresentation, the plaintiff must show that its injuries were proximately caused by its reliance on the defendant's false representation. *Heberer*, 744 S.W.2d at 443. The trial court found that "any damages Plaintiff allegedly suffered were not due to Defendant Alcorn's representations, but by Plaintiff's failure to live up to its contractual responsibilities with Defendant Amboy to deliver conforming goods."

Polar Trading argues that it "showed substantial damage proximately caused by the misrepresentation in that it could have sold

---

1. The Yellow Freight bill of lading indicates that there were 315 cases to be shipped. However, on the same form, the driver indicated that he only picked up 270 cases. When Polar Trading received the goods, employees counted 273 cases.

the goods to another buyer in time for Christmas had it not sent them to Amboy and would not have incurred the substantial shipping charges it did." Therefore, the argument continues, the court's finding to the contrary was against the weight of the evidence and was not supported by substantial evidence.

The evidence at trial showed that a large number of the ornaments shipped by Polar Trading were defective. Many of the ornaments were not properly glued together and some were not glued at all. As a result, they fell apart and were unsuitable for use as Christmas tree ornaments. Section 400.2–601, RSMo 1994, states in part:

> [I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
>
> (a) reject the whole; or
>
> (b) accept the whole; or
>
> (c) accept any commercial unit or units and reject the rest.

Pursuant to the Uniform Commercial Code, therefore, Amboy was entitled to reject the shipment in its entirety. Polar Trading's argument that it could have sold the goods to another buyer is flawed in that the court could reasonably infer from the evidence that any other buyer would also have rejected the nonconforming goods pursuant to § 400.2–601.

Polar Trading also suggests that had it not relied on Amboy's misrepresentation, it could have avoided the shipping charges it had to pay for transportation of the goods both to and from Amboy's warehouse. The contract of sale between the parties stated that Amboy would pay for the ornaments and shipping charges. However, once Polar Trading materially breached the contract by delivering nonconforming goods, Amboy was excused from further performance. *Health Related Servs., Inc. v. Golden Plains Convalescent Ctr., Inc.*, 806 S.W.2d 102, 104 (Mo.App. 1991). Amboy would have been liable for the shipping costs but for the defects in the goods. Therefore, Polar Trading's damages relating to shipment of the ornaments to Amboy were proximately caused by the delivery of defective goods, not by the broken promise to send a $2000 check.

As to the shipping charges for the retrieval of the ornaments after Amboy's rejection, a buyer has no further obligations with regard to the goods it has rejected, and the seller bears the cost of the return delivery. § 400.2–602(2), RSMo 1994. The evidence supported the trial court's finding that Polar Trading's damages were caused by its own actions in delivering defective goods rather than by its alleged reliance on a misrepresentation. The trial court's judgment in favor of Amboy on the count of fraudulent misrepresentation was not erroneous.

■ In its third point, Polar Trading argues that the court erred in finding in favor of Amboy on breach of contract because it was undisputed that Amboy had not rejected all of the goods shipped by Polar Trading, and, in fact, had sold some of the goods to third parties. Amboy still had goods in its warehouse and would owe Polar Trading for the goods it had sold or still retained. Amboy responds that Polar Trading may not recover the price of the goods sold because Polar Trading breached the contract by delivering defective goods.

Section 400.2–601(c) gives the buyer the option of accepting any commercial units and rejecting the rest in the event that the goods fail to conform to the contract. In the event that the buyer decides to accept a portion of the goods, the buyer is liable for the contract price of the accepted goods. § 400.2–607(1), RSMo 1994. Section 400.2–606(1)(c), RSMo 1994, states that acceptance of goods occurs when the buyer does any act inconsistent with the seller's ownership of the goods.

In *Paramount Sales Co. v. Stark*, 690 S.W.2d 500 (Mo.App.1985), the seller filed a breach of contract action against the buyers for their refusal to pay the contract price on goods delivered. When the initial shipment of goods arrived, the buyers inspected them, found their condition to be satisfactory, and displayed them for resale. *Id.* at 502. When other shipments began to arrive, the buyers discovered that they were defective. *Id.* The court found that the buyers had accepted those goods that it had marked with prices and displayed for sale, and held that

as to those goods the buyers were liable for the contract price. *Id.* at 505.

In this case, Amboy exercised ownership over some of the goods delivered by Polar Trading. As to the initial shipment of 14 cases, Amboy inspected them and told Polar Trading that it accepted them. Amboy is liable for the contract price as to those goods. Additionally, in response to questioning by the court, Mr. Alcorn admitted that Amboy had sold between 1200 and 1600 ornaments, and retained 15 to 25 cases of ornaments in the warehouse, even after the rest of the goods had been returned. He further admitted that Amboy would have to pay Polar Trading for the merchandise that it sold to other dealers and retained in the warehouse. Regardless of whether the rest of the goods conformed to the contract, Amboy's conduct with respect to at least some of the goods indicated acceptance. Amboy had the opportunity to reject the goods or to revoke its acceptance within a reasonable time, but failed to do so.

Amboy is liable for the contract price for those goods which Amboy accepted by retaining and by selling, in spite of the fact that some of the goods may have been defective. The only issue which remains is the number of ornaments accepted by Amboy. In view of Amboy's failure to notify Polar Trading that it was revoking its acceptance of those goods, Amboy is liable for contract price for those goods it has accepted by selling and retaining them, regardless of any defects which might exist. A hearing may be necessary to determine the number of ornaments retained and sold by Amboy. The trial court's decision in favor of Amboy on the breach of contract claim is reversed and remanded for entry of judgment in favor of Polar Trading and determination of damages. The trial court's decision in favor of Amboy on the fraudulent misrepresentation claim is affirmed.

All concur.